IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD F.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, | : | |
| Commissioner of Social Security | : | NO. 23-4226 |

**<u>MEMORANDUM AND ORDER</u>**

ELIZABETH T. HEY, U.S.M.J.                                      October 20, 2025

  This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application filed by Donald F. ("Plaintiff") for supplemental security income

("SSI") under Title XVI of the Social Security Act.  Plaintiff has filed a brief and

statement of issues in support of his request for review seeking reversal of the

Commissioner's unfavorable decision and an award of benefits.  <u>See</u> Doc. 8.  The

Commissioner has filed a motion for remand arguing that the case would benefit from

additional evaluation, which Plaintiff opposes.  <u>See</u> Docs. 13 & 14.  For the reasons that

follow, I grant the Commissioner's motion and remand the matter for further

proceedings.

---

  [1]Consistent with the practice of this court to protect the privacy interests of
plaintiffs in social security cases, I will refer to Plaintiff using his first name and last
initial.  <u>See</u> Standing Order – In re:  Party Identification in Social Security Cases (E.D.
Pa. June 10, 2024).

I.    **PROCEDURAL HISTORY**

Plaintiff applied for SSI on June 22, 2010, alleging disability as of July 1, 2002. Tr. at 99-103, 137.[2]  His application was denied on April 11, 2011, and he timely filed a request for an administrative hearing before an Administrative Law Judge ("ALJ").  Id. at 51-52, 68-69.  ALJ Suzanne Strauss ("ALJ Strauss") held a hearing on March 16, 2012, id. at 26-50, and issued a decision on April 16, 2012, finding that Plaintiff was not disabled.  Id. at 11-25.  The Appeals Council denied Plaintiff's request for review.  Id. at 1-3.

Plaintiff commenced an action in this court, which was docketed at Civil Action Number 13-3742.  By Order dated July 21, 2015, the Honorable William H. Yohn, Jr., approved and adopted the Report and Recommendation ("R&R") of the late Honorable Marilyn Heffley, and remanded the matter for further review of medical opinion evidence.  Frazier v. Colvin, Civ. No. 13-2742, Order (E.D. Pa. Jul. 21, 2015); id., R&R (E.D. Pa. June 30, 2015); tr. at 411-32.  The Appeals Council then remanded the case to an ALJ for further proceedings.  Tr. at 439-42.

ALJ Strauss conducted Plaintiff's second administrative hearing on October 20, 2016, tr. at 368-90, and issued an unfavorable decision on January 12, 2017.  Id. at 443-58.  Plaintiff sought review of the decision in the Appeals Council, which on July 7, 2022, remanded the matter finding that ALJ Strauss failed to adequately evaluate the opinion which had been the subject of the previous federal court remand.  Id. at 465-67.

---

[2]For purposes of SSI, the earliest month for which benefits can be paid "is the month following the month [the claimant] filed the application."  20 C.F.R. § 416.335.

Upon remand, the case was assigned to ALJ Jennifer Spector ("ALJ Spector" or "the ALJ"), who held Plaintiff's third administrative hearing on October 28, 2022.  Tr. at 324-67.  On August 14, 2023, ALJ Spector issued an opinion finding that Plaintiff was not disabled.  Id. at 299-318.  The Appeals Council did not assume jurisdiction, making the decision of ALJ Spector the final decision of the Commissioner.  20 C.F.R. § 416.1484(a).

Plaintiff sought review in this court on October 31, 2023, Doc. 2, and submitted a Brief and Statement of Issues in Support of Request for Review on January 3, 2024, seeking remand for an award of benefits.  Doc. 8 at 28-30.  On February 29, 2024, the Commissioner filed a motion for remand, asking the court to remand the matter for further proceedings, including further evaluation of the opinion evidence and supplemental vocational expert ("VE") evidence.  Doc. 13 ¶ 3.  Plaintiff opposes the Commissioner's motion for remand and instead seeks reversal with an award of benefits. Doc. 14.  Petitioner does not seek remand for further evaluation as an alternate remedy.[3]

## II.    STANDARD OF REVIEW

Typically, the court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence, 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999), where the issue is whether there is substantial evidence to support the Commissioner's conclusions that

---

[3]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 6.

Plaintiff is not disabled.  To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months," 42 U.S.C. § 423(d)(1), and the Commissioner employs a five-step process in making that determination:

> 1.    Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.    If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3.    If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and
>
> 5.    If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

I will begin with a summary of ALJ Spector's findings at each step of the five-step sequential evaluation.  However, because the parties do not dispute that remand is

required -- and the court agrees, see infra at 18 -- I will not engage in a typical review of the ALJ's five-step analysis.

## III.    **DISCUSSION**

### A.    **ALJ's Findings and Parties' Arguments**

In her August 14, 2023 decision, ALJ Spector found at step one that Plaintiff had not engaged in substantial gainful activity since June 22, 2010, the application date.  Tr. at 302.  At step two, the ALJ found that Plaintiff suffers from the following severe impairments: residuals of a gunshot wound to right lower extremity including peroneal nerve palsy; post-traumatic stress disorder ("PTSD"); and depressive disorder.  Id. at 302. At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listing of Impairments ("Listings").  Id. at 303.

ALJ Spector determined that Plaintiff retains the RFC to perform sedentary work with the following restrictions:

> [He] cannot climb ladders, ropes, or scaffolds, and never crawl or kneel; cannot balance on narrow slippery or erratically moving surfaces; can occasionally perform all other postural maneuvers; cannot push or pull with the lower extremities; must avoid concentrated exposure to extreme temperatures, wetness, and hazards such as unprotected heights or dangerous machinery; can understand, remember, and carry out simple instructions; occasionally interact with supervisors, coworkers, or the general public; and cannot perform work requiring specific production rate, such as assembly line work, and can deal with occasional changes in a routine work setting.

Tr. at 305.  The ALJ noted that Plaintiff was born on March 9, 1974, and was therefore 36 years of age on his application date (June 22, 2010) and 49 at the time of ALJ Spector's decision (August 14, 2023).  Id. at 316.  He has no past relevant work.  Id. Based on testimony from a vocational expert ("VE"), id. at 357-66, ALJ Spector found that Plaintiff can perform jobs that exist in significant numbers in the national economy, such as toy stuffer, addresser, and nut sorter.  Id. at 317.  As a result, the ALJ concluded that Plaintiff is not disabled.  Id. at 317-18.

In his opening brief, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ (1) failed to develop the record, (2) improperly assessed the medical opinion evidence, (3) rejected Plaintiff's testimony without reasonable explanation, (4) erroneously failed to find that Plaintiff met or equaled the Listings at step three, (5) failed to properly explain her assessment of Plaintiff's RFC, and (6) failed to meet her burden of proof at step five.  See Doc. 8 at 2-28.  Plaintiff further argues that the appropriate remedy is reversal and an award of benefits because the existing medical record establishes Plaintiff's entitlement to benefits and adjudication of his application for benefits has been delayed for more than a decade.  Id. at 28-30.

In response, the Commissioner filed a motion to remand pursuant to sentence four of 42 U.S.C. § 405(g).  See Doc. 13 ¶ 2.  Pursuant to sentence four, "[t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a hearing."  42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S.

89, 99-100 (1991).[4]  The Commissioner asserts that "[b]ased upon further review, the Commissioner has determined that Plaintiff's claim warrants further administrative consideration."  Doc. 13 ¶ 2.  Specifically, the Commissioner avers that, upon remand, "the Appeals Council will direct an [ALJ] to: (1) further evaluate the opinion evidence; (2) obtain supplemental [VE] evidence; (3) offer Plaintiff the opportunity for a hearing; (4) take any further action needed to complete the administrative record; and (5) issue a new decision."  Id. ¶ 3.

Plaintiff opposes the Commissioner's motion to remand, reiterating in his reply brief that the Commissioner's final decision should be reversed and benefits awarded because the existing medical record establishes Plaintiff's entitlement to benefits and adjudication of his application for benefits has been delayed for more than a decade.  Doc. 14 at 4-6.  Because Plaintiff does not seek remand in the alternative, the decision whether to remand this matter or reverse with an award of benefits requires consideration of the relevant medical evidence.

---

[4]In contrast, a matter be remanded pursuant to sentence six, which provides that

> [t]he court may, on motion of the [Commissioner] . . . remand the case to the [Commissioner] for further action by the [Commissioner], and it may at any time order additional evidence to be taken before the [Commissioner], but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g); see also Melkonyan, 501 U.S. at 100.  The Commissioner does not rely on new evidence in its motion here.

**B.**    **Medical Evidence Summary**

The relevant period under consideration is June 22, 2010 (the application date) through August 14, 2023 (the date of ALJ Spector's decision). Plaintiff's medical history includes physical and mental impairments arising at least in part from a 2002 incident in which Plaintiff was shot in his right leg and witnessed the murder of his best friend while trying to break up a fight. See tr. at 253, 291, 341. Despite the duration of Plaintiff's impairments and the lengthy procedural history of his pending application for benefits, the medical record consists mostly of consultative examinations performed in 2011 and 2023, with remarkably few treatment notes from the entirety of the relevant period.

The medical record does not contain any records regarding Plaintiff's treatment in the immediate aftermath of his 2002 shooting, or for several years thereafter. The earliest medical evidence is from March 10, 2008, when Plaintiff presented to Friends Hospital, a psychiatric hospital. Tr. at 197-207. Triage notes indicated a history of suicide attempts, that Plaintiff was accompanied by his mother and girlfriend and did not want to be there, and admitted to smoking "wet" (PCP). Id. at 197-99. [5] Case management notes indicate that Plaintiff could not give a reason for his visit other than to see his aunt, and that he became defensive when asked about his most recent period of sobriety. Id. at 202-03. A psychiatric evaluation performed the next day noted Plaintiff's chief complaint as paranoid delusions. Id. at 204. He denied having a past psychiatric history. Id. The attending physician diagnosed Plaintiff with PCP intoxication and chronic substance

---

[5]PCP, or phencyclidine, is a mind-altering drug that may lead to hallucinations. See https://www.drugs.com/illicit/pcp.html (last visited Sept. 25, 2025).

abuse, assessed him with a Global Assessment of Functioning ("GAF") score of 50,[6] and

recommended reassessment after Plaintiff's PCP intoxication resolved.  Id. at 206.

On April 27, 2008, Plaintiff was involuntarily hospitalized at Albert Einstein

Medical Center ("Albert Einstein"), where he was diagnosed with substance induced

psychosis.  Tr. at 209, 211.  He was assessed with a GAF score of 30.  Id. at 211.[7]

Plaintiff received inpatient individual and group therapy, began taking Risperdal,[8] and

"showed significant improvement within several days."  Id. at 218.  His stressors

included "frequent PCP use, paying child support, and has a 10-month-old son and 2

other children."  Id. at 217.  He was discharged on May 1, 2008, with a GAF score of 80.

Id. at 218-19.[9]  The discharge summary included findings of a physical examination

---

[6]The GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR"), at 34.  A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.
The DSM-5, which replaced the DSM-IV-TR in 2013, eliminated reference to the GAF score.  However, an ALJ must consider a GAF score with all of the relevant evidence in the case file.  Nixon v. Colvin, 190 F. Supp.3d 444, 447 (E.D. Pa. 2016)).

[7]A GAF of 21-30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations [or] serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) [or] inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  DSM IV-TR at 34.

[8]Risperdal (generic risperidone) is an antipsychotic medication.  See https://www.drugs.com/risperdal.html (last visited Sept. 25, 2025).

[9]A GAF score of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument), no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork."  DSM IV-TR at 34.

which were "unremarkable except for a mild foot drop of the right foot secondary to nerve damage." Id. at 218.

On November 18, 2010, Jopindar Harika, M.D., of the Multicultural Wellness Center ("Wellness Center"), performed a psychiatric assessment. Tr. at 291-94. Plaintiff's presenting problems were flashbacks related to the 2001 shooting incident, as well as nightmares, depression and anxiety. Id. at 291. He reported an involuntary psychiatric hospitalization in 2007 for depression. Id.[10] Upon mental status examination, Plaintiff reported auditory and visual hallucinations, paranoia, depression, and anxiety, with flashbacks and nightmares from being shot and his friend being killed. Id. He has difficulty concentrating, loses things, is distracted by external stimuli, forgetful in daily activities, and does not appear to listen unless directly addressed. Id. Dr. Harikar opined that Plaintiff had a guarded prognosis. Id. at 292. The doctor diagnosed Plaintiff with PTSD, major depressive disorder ("MDD") with psychotic features, generalized anxiety disorder ("GAD"), and attention deficit hyperactivity disorder ("ADHD"), inattentive type. Id. at 293. Dr. Harikar prescribed Cymbalta[11] and Risperdal and recommended individual therapy. Id. at 294.

Plaintiff continued to receive treatment at Wellness Center from December 2010 to June 2011. Tr. at 285-88 (examinations on 12/18/10, 1/19/11, 4/28/11 & 6/9/11).

---

[10]The medical record does not reflect a 2007 psychiatric hospitalization, and therefore Plaintiff was likely referring to his April 2008 psychiatric hospitalization at Albert Einstein.

[11]Cymbalta (generic duloxetine) is used to treat MDD and GAD. See https://www.drugs.com/cymbalta.html (last visited Sept. 25, 2025).

These progress notes are difficult to decipher, but the examining physician circled "sad" regarding Plaintiff's mood on December 18, 2010, id. at 288, "neutral" as to his depressive state on January 19, 2011, and indicated that Plaintiff was "cooperative," "neutral," "stable" and "improved" on April 28 and June 9, 2011. Id. at 285-86.

On February 14, 2011, Carl Herman, M.D., performed a psychiatric consultative examination of Plaintiff for the Bureau of Disability Determination. Tr. at 253-54. Dr. Herman noted that Plaintiff continued to experience intrusive thoughts related to the 2002 shooting, and Plaintiff reported chronic depression with no suicidal or homicidal ideation. Id. at 253. The doctor characterized Plaintiff as hypervigilant without paranoia or mania. Id. Dr. Herman noted Plaintiff's 2008 psychiatric hospitalization for PCP intoxication, with no recurrence, and that Plaintiff had been "clean" for four years. Id. Plaintiff had been attending outpatient therapy for two years, and had been taking Risperdal, generic Elavil,[12] and Cymbalta. Id. Plaintiff could perform routine chores except cooking and he could shop and take the bus alone, occasionally attend church, manage his money, socialize, play a keyboard, occasionally work as a disc jockey, watch television, and collect model cars and comic books. Id. Upon mental status examination, Dr. Herman found moderately impaired short-term memory, moderately depressed mood, and pre-occupied but logical thinking, with otherwise normal findings. Id. at 253-54. The doctor diagnosed Plaintiff with PTSD, substance dependence in remission, and chronic right leg pain, noting that he "is still plagued by intrusive thoughts and depressed mood" and that

---

[12]Elavil (generic amitriptyline) is an anti-depressant. See https://www.drugs.com/elavil.html (last visited Sept. 25, 2025).

he had never recovered from the shooting incident. Id. at 254. In an accompanying

medical source statement of Plaintiff's ability to perform work-related mental activities,

Dr. Herman opined that Plaintiff had moderate limitation in his abilities to understand,

remember, and carry out detailed instructions, and to respond appropriately to work

stressors and changes in a routine work setting. Tr. at 255-56.

On February 7, 2011, Harris Ross, D.O., performed a consultative physical

examination of Plaintiff for the Bureau of Disability Determination. Tr. at 246-49.

Plaintiff acted appropriately, with no signs of depression, fatigue or anxiety. Id. at 248.

He exhibited a mildly antalgic gait, weakness in the right leg, and an inability to perform

a heel-and-toe gait on the right, although Dr. Ross noted that Plaintiff's "ambulation in

general is functional." Id. Plaintiff's right Achilles reflex was absent, he exhibited

tenderness in the area above the right knee where he was shot, his right lower leg had

"mild to moderate approximately 20% atrophy," he had 4/5 strength in the right lower

extremity while the left leg was normal, and range of motion of Plaintiff's right ankle was

markedly limited. Id. Dr. Ross's impressions were foot drop on the right, atrophy of the

muscles on the right lower extremity, history of gunshot wound to the same extremity,

depression as per history, and chronic pain in the lower right extremity. Id. at 248-49. In

a contemporaneous medical source statement of Plaintiff's ability to perform work-

related physical activities, Dr. Ross opined that Plaintiff could occasionally lift and carry

up to 20 pounds, stand and/or walk for up to 1 hour in an 8-hour workday, and had no

limitation in his ability to sit. Id. at 250. Dr. Ross opined that Plaintiff could never

stoop, crouch, balance or climb, could occasionally bend and kneel, and should avoid

heights, temperature extremes, wetness, fumes, and humidity.  Id. at 251.

On February 16, 2011, State agency consultant Grant Croyle, Ph.D., completed a

mental RFC assessment of Plaintiff based on a review of records, finding that Plaintiff

was no more than moderately limited in any work-related mental activity.  Tr. at 259-62.

Specifically, Dr. Croyle opined that Plaintiff was moderately limited in his ability to

understand, remember, and carry out detailed instructions; maintain attention and

concentration for extended periods; perform activities within a schedule, maintain regular

attendance, and be punctual; complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods; and respond appropriately to

changes in the work setting.  Id. at 259-260.  Dr. Croyle also completed a Psychiatric

Review Technique ("PRT"), finding that Plaintiff had PTSD and substance abuse in

remission.  Id. at 268, 271.[13]  In assessing the paragraph "B" criteria of the corresponding

Listings, Dr. Croyle opined that Plaintiff had moderate difficulty in maintaining

concentration, persistence or pace; mild restriction of daily activities and in maintaining

social functioning; and no repeated episodes of decompensation.  Id. at 273.  The doctor

further opined that Plaintiff did not meet the paragraph "C" criteria.  Id. at 274.

---

[13]The PRT form is used by the Commissioner to evaluate mental impairments, including whether a claimant meets or medically equals the mental health Listings, which consist of criteria under paragraphs "A", "B," or "C."  See Ramirez v. Barnhart, 268 F. Supp.2d 484, 487 (E.D. Pa. 2003).

On March 22, 2011, State agency consultant Minda Bermudez, M.D., completed a physical RFC assessment based on a review of records.  Tr. at 277-83.  Dr. Bermudez listed Plaintiff's primary diagnosis as right foot-drop status post gunshot wound, and his secondary diagnosis as right leg atrophy and chronic neuropathic pain secondary to the gunshot wound.  Id. at 277.  The doctor opined that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently; was limited to standing and walking for a total of 4 hours and sitting for about 6 hours in an 8-hour workday; and should avoid right foot controls or repetitive motion of the right foot.  Id. at 278.  Dr. Bermudez further opined that Plaintiff could frequently stoop; occasionally use ramps and stairs, balance, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds.  Id. at 279.  Plaintiff should also avoid concentrated exposure to extreme heat and cold, wetness, vibration, fumes and dust, and hazards such as machinery and heights.  Id. at 280.

The only post-2011 medical treatment record is from September 17, 2014, when Plaintiff saw Gerald Tadley, D.O., for complaints of neck, back, and knee pain.  Tr. at 679-81.  Dr. Tadley listed Plaintiff's problems as peroneal nerve palsy;[14] gunshot wound of lower leg, right, complicated; and chronic back pain.  Id. at 680.  Upon examination, Dr. Tadley noted that Plaintiff appeared alert and oriented, and in no acute distress.  Id. He had a puncture scar on the right knee with no swelling or warmth of the knee, and palpable tenderness of his lumbar spine with muscle spasm and decreased range of

---

[14]Peroneal nerve palsy is paralysis of a nerve pertaining to the fibula or to the lateral aspect of the leg.  DIMD at 1345, 1399.

motion.  Id.  Dr. Tadley prescribed Meloxicam[15] and ordered blood work for future follow-up.  Id. at 680-81.  No follow-up visits are contained in the record.[16]

On May 4, 2023 -- more than eight years later -- Anne Greenberg, M.D., performed a consultative internal medicine examination of Plaintiff.  Tr. at 682-85.  Dr. Greenberg provided more details regarding Plaintiff's post-gunshot wound treatment, noting that he underwent an eighteen-month course of physical therapy ("PT") followed by a shorter course,[17] and that he sometimes wears an ankle/foot orthotic but did not bring it to the evaluation.  Id. at 682.  Plaintiff reported a history of lower back pain, for which he uses a TENS unit, id., that he had a shin infection on his lower leg for a few months, and that his current medications were cephalexin and gabapentin.  Id. at 682-83.[18]  He lives at a family home where he does not need help, he does not drive, his hobby is music production, and he enjoys watching television, reading, and socializing with friends.  Id. at 683. Plaintiff did not identify a primary care provider.  Upon examination, Plaintiff exhibited "a very mild steppage gait" and he could not walk on

---

[15]Meloxicam is a non-steroidal anti-inflammatory drug used to relieve pain, tenderness, swelling, and stiffness caused by arthritis.  See https://www.drugs.com/meloxicam.html (last visited Sept. 25, 2025).

[16]ALJ Spector issued a subpoena for records to Dr. Tadley, but the record contains no responsive records.  See tr. at 595-98 (subpoena).  Also, the administrative record does not contain treatment notes from any other medical provider after June 2011.

[17]No PT treatment notes are contained in the administrative record.

[18]A TENS unit uses electrical nerve stimulation as a treatment for pain.  See https://www.drugs.com/cg/how-to-use-a-tens-unit.html (last visited Sept. 25, 2025). Cephalexin is an antibiotic.  See https://www.drugs.com/cephalexin.html (last visited Sept. 25, 2025).  Gabapentin is an anti-epileptic used to treat partial seizures and certain nerve pain.  See https://www.drugs.com/gabapentin.html (last visited Sept. 25, 2025).

heels and toes secondary to diminished range of motion of the right ankle.  Id. at 684.

His strength was 5/5 in all extremities, except at the right ankle with diminished range of

motion.  Id. at 685.  Dr. Greenberg diagnosed Plaintiff with history of gunshot wound to

his right shin, posttraumatic peroneal neuropathy of the right lower extremity, lower back

pain, and depression, and assessed his prognosis as fair.  Id.

    In a contemporaneous medical source statement of Plaintiff's ability to perform

work-related physical activities, Dr. Greenberg opined that Plaintiff could lift and carry

up to 10 pounds continuously, 20 pounds frequently, and 50 pounds occasionally.  Id. at

686.  At one time without interruption, Plaintiff could sit for 4 hours, stand for 2 hours,

and walk for 1 hour; and in an 8-hour workday, he could sit for 8 hours, stand for 4 hours,

and walk for 2 hours.  Id. at 687.  He could frequently reach, handle, finger, feel, and

push/pull with his bilateral hands, could frequently operate foot controls with his left foot

and never with his right foot.  Id.  He could frequently balance and stoop; occasionally

climb stairs and ramps, kneel, crouch, and crawl; and never climb ladders or scaffolds.

Id. at 689.  Plaintiff could never operate a motor vehicle, occasionally be exposed to

unprotected heights and moving mechanical parts, and frequently be exposed to all other

environmental limitations.  Id. at 690.  He could also perform all activities of daily living

except he cannot walk a block at a reasonable pace on rough or uneven surfaces, or climb

a few steps at a reasonable pace with the use of one railing.  Id. at 691.

    Also on May 4, 2023, Martha DiPrinzo, M.A., performed a consultative mental

status evaluation of Plaintiff.  Tr. at 698-701.  Plaintiff reported that he performed

seasonal lawn mowing work, that he performed the same work the year before, and that

he cannot work full-time due to left leg pain and nerve damage. Id. at 698. He denied any history of psychiatric hospitalizations or current anxiety-related symptoms, reported that depressive symptoms had lessened, and reported ongoing flashbacks, nightmares, intrusive thoughts, and difficulty concentrating. Id. at 699. Plaintiff's mental status examination yielded normal findings except for mild impairment of attention and concentration, and recent and remote memory skills. Id. at 700. Dr. DiPrinzo recommended that Plaintiff resume outpatient mental health treatment, and opined that his prognosis was good with mental health treatment. Id. at 701.

Ms. DiPrinzo also completed a medical source statement of Plaintiff's ability to do work-related mental activities. Tr. at 703-05. Ms. DiPrinzo opined that Plaintiff had mild limitation in every category related to his ability to understand, remember, and carry out instructions, citing Plaintiff's depression and PTSD, and in every category related to his ability to interact appropriately with supervisors, co-workers and the public, citing his anxiety and PTSD symptoms. Id. at 703-04.

### C.    Commissioner's Motion for Remand

As previously noted, Defendant moves to remand the case based on a determination that "Plaintiff's claim warrants further administrative consideration," Doc. 13 ¶ 2, and Plaintiff opposes the motion and instead argues for reversal and award of benefits. Doc. 14 at 4-6. Plaintiff argues that an award of benefits is warranted because substantial evidence shows that he is disabled, and because adjudication of his application has been unreasonably protracted. Doc. 8 at 29-30; Doc. 14 at 4-6.

As an initial matter, a court-ordered award of benefits is appropriate "<u>only</u> when the administrative record of the case has been developed fully and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." <u>Newell v. Comm'r of Soc. Sec.</u>, 347 F.3d 541, 549 (3d Cir. 2003) (emphasis added) (citing <u>Podedworny v. Harris</u>, 745 F.2d 210, 221-22 (3d Cir. 1984)). Thus, Plaintiff is correct insofar as the standard requires the record as a whole to "indicate" that that the claimant is disabled and not, as Defendant states, that the record "establish" entitlement to benefits. <u>See</u> Doc. 14 at 2-3; Doc. 13 at 2.

Having correctly identified the standard for authorizing a court-ordered award of benefits, Plaintiff principally argues that an award of benefits is appropriate because substantial evidence indicates that he is disabled. I disagree for several reasons. First, because the determination of disability rests with the Commissioner, <u>see</u> 20 C.F.R. § 416.903, federal courts have no fact-finding role in Social Security cases. <u>Grant v. Shalala</u>, 989 F.2d 1332, 1338 (3d Cir. 1993) (citing <u>Hummel v. Heckler</u>, 736 F.2d 91, 93 (3d Cir. 1984)). Thus, although Defendant concedes that remand is warranted because ALJ Spector failed to address all aspects of Dr. Greenberg's opinion, Doc. 13 ¶ 5; <u>id.</u> at 8,[19] the ALJ is the proper person to evaluate this evidence and explain her factual

---

[19]The court agrees with the Commissioner's concession in this regard, and that remand is warranted. For example, ALJ Spector did not mention Dr. Greenberg's opinion that Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces, and could not climb a few steps at a reasonable pace with the use of a single handrail, both of which are relevant to a determination whether Plaintiff can ambulate effectively for purposes of the Listings. Additionally, although ALJ Spector issued a subpoena for Dr. Tadley's treatment records, the ALJ failed to follow-up when the doctor did not provide responsive records.

findings; it not for the court to address all aspects of the doctor's opinion in the first instance. To the extent Plaintiff argues that the ALJ's unfavorable decision was based on speculation or her own lay opinions, he in essence asks the court to do the same.

Second, sparsity of the medical record makes it impossible for the court to make an informed decision as to whether Plaintiff is entitled to benefits. Dr. Tadley's failure to provide treatment records in response to a subpoena show that the administrative record is not fully developed. Additionally, although it is clear that Plaintiff has physical and mental residuals from his 2002 gunshot wound -- and that the residuals existed throughout the relevant period -- it is not clear that the residuals support a finding of disability during the relevant period. Notably, ALJ Spector provided a narrative summary of the medical record, including Plaintiff's testimony and the findings of the 2011 and 2023 consultative examiners, see tr. at 17-21, and both the ALJ's decision and the medical summary above demonstrate disagreements among the examiners as to Plaintiff's ability to perform various work-related functions. There being no indication of entitlement to disability in the existing record, remand for further consideration is proper.

Third and relatedly, the record contains only one day of treatment by Dr. Tadley in 2014, and ALJ Spector failed to obtain the remainder of the doctor's records even though they appear to be the only treatment records available beyond those from the Wellness Center records from the period December 2010 to June 2011. Although Plaintiff had counsel during his administrative proceedings, an ALJ is not absolved of the duty to develop the record when the claimant is represented by counsel. As the Honorable Michael Baylson explained:

> While a claimant bears the burden of proving his
> disability . . . the Third Circuit "has repeatedly emphasized
> that the special nature of proceedings for disability benefits
> dictates extra care on the part of the agency in developing an
> administrative record and in explicitly weighing all
> evidence." Dobrowolsky [v. Califano], 606 F.2d [403,] 406-
> 07 [(3d Cir. 1979)].  "ALJ's have a duty to develop a full and
> fair record in social security cases," Ventura v. Shalala, 55
> F.3d 900, 902 (3d Cir. 1995), and this duty is heightened
> when the claimant appears at the hearing without the benefit
> of counsel. . . .  When an ALJ "has failed to exercise his
> authority to attempt to fill significant evidentiary gaps that are
> material to the disability determination," remand is
> appropriate. Comiskey [v. Astrue, No. 09-0252, 2010 WL
> 308979,] at *7 [(E.D. Pa. Jan. 27, 2010)] (quoting Jozefick v.
> Shalala, 854 F. Supp. 342, 349 (M.D. Pa. 1994).

Rosa v. Colvin, 956 F. Supp.2d 617, 621-22 (E.D. Pa. 2013).  Thus, although the ALJ has

a heightened duty to develop the record in the case of an unrepresented claimant, the duty

is not dispelled by the presence of counsel.  See Cassidy v. Colvin, Civ. No. 15-711, 2016

WL 1086354, at *3-4 (W.D. Pa. Mar. 21, 2016) (remanding for subpoena of treating

source's records in counseled case); see also Johnson v. Massanari, Civ. No. 00-5618,

2001 WL 873046, at *2 (E.D. Pa. June 20, 2001) (remand warranted where treating

physicians' records were missing, despite counsel's request for subpoena, because

"records of a claimant's treating physician are perhaps the most important evidence to be

considered by the ALJ in making his disability determination and certainly qualifies as

evidence 'reasonably necessary for the full presentation of a case'").  Simply stated, the

court cannot make a determination on the record as a whole without the benefit of a

complete record, particularly where there are so few treatment records.

Plaintiff also argues that remand for payment of benefits is appropriate in this case due to the excessive length of time which has passed since Plaintiff filed his application for benefits, particularly in light of the prior remands. See Doc. 14 at 5. There is no question that this case has been excessively delayed in both the administrative process and in the courts, and Defendant does not contest Plaintiff's averment that "Defendant is at fault with respect to much of this delay." Doc. 8 at 30. Nevertheless, excessive delay is not an independent basis to award benefits -- a proposition Plaintiff acknowledges by asserting "that unreasonably protracted proceedings are an additional factor militating in favor of awarding benefits." Id. at 29 (emphasis added). Delay alone is an insufficient basis to award benefits, rather it is a factor to be viewed in addition to evidence indicating that Plaintiff is entitled to benefits, which is lacking in this case for the reasons already discussed. See, e.g., Podedworny, 745 F.2d at 221-22; see also Cordero v. Kijakazi, 597 F. Supp.3d 776, 821 (E.D. Pa. 2022) ("The Court of Appeals has held that where there has been inordinate delay, coupled with an existing record that contains substantial evidence supporting a finding of disability, a reversal with direction to award benefits is appropriate, rather than a remand for further proceedings.") (emphasis added) (citing Morales v. Apfel, 225 F.3d 310, 320 (3d Cir. 2000)).

There is no dispute that the determination whether to remand a case or direct an award of benefits is case-specific, and therefore it comes as no surprise that both parties can marshal cases from this and other jurisdictions to support their respective positions. Certainly, where delays and multiple remands have created a sizable medical record, logic suggests that protracted delay would militate toward reversal with an award of

benefits.  However, in this case the lengthy delay has not created a sizable medical record, and in fact the opposite is true.  The court has not found a case where the final decision of the Commissioner has been reversed and benefits awarded where the cumulated medical record is as sparse as the one presented here, or where the consultative medical opinions have been separated by more than a decade with virtually no documented treatment in the interim.  Therefore, although Plaintiff identifies several cases where courts in this circuit have remanded with an award of benefits, see Doc. 8 at 28-30, those cases do not compel a particular outcome in this case, nor are they particularly persuasive given the case-specific facts presented here.  See, e.g., Brownawell v. Comm'r of Soc. Sec, 554 F.3d 352, 358 (3d Cir. 2008) (reversed and benefits awarded after delay of eight years and two months, "as substantial evidence on a fully developed record indicates that [the claimant] is disabled"); Podedworny, 745 F.2d at 223 (reversed and benefits awarded after delay of more than seven years "[b]ecause we find that substantial evidence on the present record dictates a finding . . . that [the claimant] is disabled and entitled to disability benefits").

In Morales, the Third Circuit found that an award of benefits was appropriate because "[t]he disability determination has already taken ten years and the record is unlikely to change."  225 F.3d at 320.  In contrast, although Plaintiff's case is more than thirteen years old -- and although Plaintiff has very little treatment history -- additional treatment records from Dr. Tadley apparently exist but are missing from the record.  As previously noted, these records are particularly important given the sparsity of records in this case.

In <u>Henderson v. Colvin</u>, the Honorable David A. Strawbridge acknowledged that the claimant's case had "a lengthy administrative and district court history," including six administrative hearings, five administrative decisions, and four appeals to federal court over the course of more than nine years.  Civ. No. 12-5316, 2014 WL 543111, at *2, R&R (E.D. Pa. Dec. 20, 2013), <u>approved and adopted</u>, <u>id.</u>, at *1 (E.D. Pa. Oct. 24, 2014) (Gardner, J.).  Nevertheless, as here, the court was "unable to conclude that 'substantial evidence on the record as a whole indicates that [the claimant] is disabled and entitled to benefits.'"  <u>Id.</u> at *14 (quoting <u>Podedworny</u>, 745 F.2d at 221-22).  Also as here, the court in <u>Henderson</u> noted that although remand was warranted, the ALJ had provided a thorough summary and provided some explanation as to why she credited or discredited opinion evidence, and therefore "we are unwilling, as the reviewing court, and on the record before us, to recommend that benefits be awarded."  <u>Id.</u>  I am persuaded by the court's reasoning in <u>Henderson</u>, particularly because the record in that case was more developed than the present case, <u>see id.</u> at *2-4, and although it involved a shorter delay, it involved more hearings, more administrative decisions, and more district court appeals than the present case.

For all of the above reasons, I will grant Defendant's motion to remand for further proceedings and deny Plaintiff's request that benefits be awarded.  On remand, the ALJ shall attempt to obtain Dr. Tadley's full treatment records, shall obtain additional medical expert opinion as to Plaintiff's impairments and limitations during the entire relevant period, and shall undertake any further proceedings deemed necessary.

An appropriate Order follows.